IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-00991-PAB-TPO

ESTATE OF IAN DAVID LOCKHART, by and through its personal representative,
DAVID LOCKHART, and
DAVID LOCKHART, individually,

      Plaintiffs,

v.

SHERIFF JAMES VAN BEEK, in his official and individual capacities,
CAPTAIN GREGORY VAN WYK, in his official and individual capacities,
UNDERSHERIFF DAN LOYA, in his official capacity,
DEPUTY ANTHONY VALDEZ, in his official and individual capacities,
DEPUTY ANDREW VIGIL, in his official and individual capacities,
AVON POLICE OFFICER BALMORE HERRERA, in his official and individual capacities,
EAGLE COUNTY SHERIFF'S OFFICE, and
EAGLE COUNTY BOARD OF COMMISSIONERS,

      Defendants.

---

## ORDER

---

      This matter comes before the Court on Undersheriff Dan Loya and the Board of County Commissioners' Motion to Dismiss Claims in the First Amended Complaint [Docket No. 43] and Defendant Herrera's Motion to Dismiss Plaintiffs' First Amended Complaint [Docket No. 47]. Plaintiffs filed responses, Docket No. 59; Docket No. 60, and defendants filed replies. Docket No. 61; Docket No. 62. With the Court's permission, plaintiffs filed a surreply. Docket No. 78. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

## I. BACKGROUND[1]

This case arises out of the suicide of Ian David Lockhart ("decedent") while in

pretrial detention at the Eagle County Detention Facility ("Detention Facility") in Eagle

County, Colorado on April 13, 2023.  Docket No. 36 at 2, ¶¶ 1-3.  The Detention Facility

is run by the Eagle County Sheriff's Department (the "ECSO").  *Id.* at 5, ¶ 22.  The

plaintiffs are the estate of Ian David Lockhart, as represented by decedent's father and

personal representative, David Lockhart (the "estate"), and David Lockhart on his own

behalf.  *Id.* at 3-4, ¶¶ 9-10.  The defendants are Sheriff James Van Beek, the Sheriff of

Eagle County; Captain Gregory Van Wyk, the ECSO officer in charge of the Detention

Facility; ECSO Undersheriff Dan Loya; ECSO Deputies Anthony Valdez and Andrew

Vigil; the ECSO itself;[2] the Eagle County Board of Commissioners; and Sergeant

Balmore Herrera of the Avon Police Department (the "APD").

Undersheriff Loya and the Eagle County Board of Commissioners filed a motion

to dismiss under Federal Rule of Civil Procedure 12(b)(6), Docket No. 43, as did Sgt.

Herrera.  Docket No. 47.

Decedent's first alleged interaction with law enforcement occurred on January

15, 2023, when ECSO deputies detained him for making suicidal statements.  *Id.* at 7,

¶¶ 29-34.  Members of the Eagle County Paramedic Services ("Paramedic Services")

assessed decedent and transported him to Vail Health.  *Id.*, ¶¶ 32-34.  The next day,

Vail Health had decedent transferred to Centennial Peaks Hospital, a behavioral health

---

[1] The facts below are taken from plaintiffs' first amended complaint, Docket No. 36, and are presumed to be true, unless otherwise noted, for purposes of ruling on defendants' motions to dismiss.

[2] While the ECSO is listed in the caption of the complaint, *id.* at 1, no counts within the complaint are specifically directed at the ECSO.

hospital, on an M1 Psychiatric Hold.[3]  *Id.* at 7-8, ¶¶ 37-40.  Centennial Peaks discharged decedent on January 20, 2023 after diagnosing him with major depressive disorder and prescribing him several medications.  *Id.* at 8, ¶¶ 41-42.

On January 30, 2023, officers from APD responded to a disturbance call regarding decedent.  *Id.*, ¶ 43.  APD placed decedent into custody and outfitted him with a helmet to protect him from harming himself.  *Id.*, ¶ 44.  Officer Corey S. Baldwin transported decedent to the Detention Facility; during the drive to the Detention Facility, decedent repeatedly stated his intention to commit suicide.  *Id.* at 9, ¶ 46.  At the Detention Facility, ECSO employees initiated protocols for a suicidal detainee, and Officer Baldwin completed an intake form noting that decedent was suicidal.  *Id.*, ¶¶ 47-49.

On February 4, 2023, APD was again called to a disturbance involving decedent.  *Id.*, ¶ 51.  This time, Officer Jonathan P. Lovins arrested decedent and transported him to Vail Health; during the drive to Vail Health, decedent stated that he wanted the police to kill him.  *Id.*, ¶¶ 52-54.  After an initial assessment at Vail Health, which involved several more statements by decedent regarding his desire for the police to kill him, a Vail police officer transported decedent to the Detention Facility.  *Id.* at 10, ¶¶ 55-61.  Upon arrival at the Detention Facility, a mental-health provider assessed decedent and learned of his desire either to kill himself or to be killed by a police officer.  *Id.* at 10-11, ¶¶ 63-68.  The mental-health provider recommended that decedent again be placed on an M1 Psychiatric Hold.  *Id.* at 11, ¶ 71.  Paramedic Services then transported decedent

---

[3] Colo. Rev. Stat. § 27-65-101 provides for an M1 Psychiatric Hold when an individual is deemed to be in imminent danger of harming himself or others.  *Id.* at 8, ¶ 38.

back to Vail Health.  *Id.*, ¶ 72.  The next day, February 5, a mental-health provider at

Vail Health assessed decedent.  *Id.* at 12-13, ¶¶ 78-82.  On February 6, Paramedic

Services transported decedent to Centennial Peaks.  *Id.* at 13, ¶ 83.  Mental-health

providers at Centennial Peaks assessed decedent and admitted him to the hospital.  *Id.*

at 14, ¶¶ 87, 91.  After treating decedent, Centennial Peaks released him into police

custody on February 10.  *Id.* at 15, ¶ 94.

On April 6, 2023, Sgt. Balmore Herrera of the APD responded to a disturbance

call involving decedent.  *Id.*, ¶ 95.  Sgt. Herrera arrested decedent and transported him

to the Detention Facility.  *Id.*, ¶ 96.  According to the complaint, Sgt. Herrera wrote the

following regarding his interactions with decedent:

> As we were escorting Ian down the stairs, he began yelling at his father, that he
> was going to kill himself and that he would be responsible, he told his happy[sic]
> that he hoped he would be happy knowing that Ian killed himself because of him.
> Ian was verbally abusive towards me, he stated he wanted to go to the hospital, I
> asked him why, he stated that he wanted to kill himself and preferred to be at the
> hospital instead of the jail.  I advised Ian that I would notify the jail deputies of his
> statement, and I would ensure that he had the ability to speak with someone who
> could help him.  Ian stated he didn't want to speak to the hope center, I explained
> to Ian that the jail would be able to provide him with resources.  During the
> transport to the Jail, Ian's demeanor would change from crying, kicking the cage
> and at times hitting his head on the side plexi-glass.  Every time I observed Ian
> hit his head, I would ask him not to do it, he would immediately stop.  He did this
> several times, but complied every time I asked him to stop.  Ian continually
> repeated that he was going to kill himself once he got to the jail, that it was easy
> for him to hang himself and that I would be responsible for his death.
> Once at the jail, Ian refused to exit the car, I unbuckled the prisoner
> restraint, Ian kept trying to hit his head.  I assisted Ian out of the vehicle, cradling
> his head with my arm to ensure he wouldn't hit me or try to otherwise hurt
> himself.  Once Ian was out of the vehicle, I transitioned to an escort hold and
> escorted Ian into the holding area of the jail.  Ian would refuse to sit down, I
> applied direct pressure above his hip near his abdomen to assist him into a
> sitting position, I did not want Ian ambulatory to prevent Ian from injuring himself.
> I secured Ian to the bench by utilizing one of the restraint loops and a second set
> of handcuffs.  Ian continued his verbal aggression towards me, the jail deputies
> exited and attempted to de-escalate Ian, he did not listen and continually made
> suicidal statements to them.  I filled out the pre-booking questionnaire, one of the

4

> questions was regarding suicidal statements made by the arrestee, I checked
> yes on that portion of the form and advised Jail Deputies that Ian had threatened
> to hang himself once inside the jail.  I was advised by the Jail Deputies that they
> would take note of that, and that Ian also made similar statements to them.  I
> transferred custody of Ian to the ECSO Jail Deputies.

*Id.* at 15-16, ¶ 97.

Once at the Detention Facility, decedent was "wrapped and fogged," a process

that involves being dressed in a mesh outfit, placed in a restraint chair, and sprayed

with pepper spray.  *Id.* at 16, ¶ 99.  ECSO officials also placed decedent into the jail's

STEP monitoring system for inmates at risk of committing suicide.  *Id.* at 17, ¶ 105.

Initially, decedent was at the STEP 1 level, which meant that decedent's cell was

without any items that he might be able to use to hang himself, and deputies checked

on decedent every 15 minutes.  *Id.*, ¶¶ 106-08.  During this time, Deputy Vigil observed

decedent kicking his cell and smearing feces on the wall, and both Deputies Vigil and

Valdez heard decedent making suicidal statements.  *Id.* at 18, ¶¶ 112-16.

Mental-health assessments for decedent also began on April 6.  *Id.* at 18-19,

¶¶ 117-119.  Clinicians from Your Hope Center, a mental health provider working with

the Detention Facility, assessed decedent that day and heard his suicidal statements

and observed his behaviors.  *Id.*, ¶ 119.  After the evaluation, Dr. Theresa Haynes, the

clinical director of Your Hope Center, recommended to Captain Van Wyk that decedent

be hospitalized so that he could receive a higher level of care.  *Id.* at 19, ¶¶ 120-23.

Captain Van Wyk rejected that recommendation.  *Id.*, ¶ 124.

A second evaluation by Your Hope Center on April 7 found that decedent was

still suicidal.  *Id.* at 20, ¶ 126.  But, after an evaluation on April 8, decedent moved to

STEP 2, at which point he received a normal mattress, bedding, and clothes, and

deputies were to check on him every 30 minutes. *Id.*, ¶ 129. On April 10, ECSO

deputies again "fogged" decedent. *Id.*, ¶ 131. Your Hope Center evaluated decedent

that day. *Id.* at 21, ¶ 132. Decedent moved to STEP 3, where he received some

personal items, but was still to be checked on every 30 minutes. *Id.* at 21, ¶¶ 132-134.

Decedent remained in a solitary cell, with a video camera monitoring every part of the

cell except for the toilet. *Id.*, ¶ 134.

On April 11, ECSO Deputy Kyle DeVries wrote a staff-wide email to the

Detention Facility staff saying that decedent had stated that he wanted to die and that

he would tell Your Hope Center staff whatever they wanted to hear in order to "get out

of holding." *Id.*, ¶¶ 135-37. Deputy Anthony Valdez, who worked at the Detention

Facility, received this email and relayed its contents to Your Hope Center clinicians. *Id.*

at 21-23, ¶¶ 137-39, 151.

On April 12 at 1:30 p.m., the video camera in decedent's cell recorded him

fashioning his bedsheet into a noose, putting it around his neck, adjusting it, and then

hiding the noose under his blanket. *Id.* at 22, ¶ 144. The video shows him tinkering

with the noose again at 1:50 p.m. and 2:02 p.m. *Id.* at 22-23, ¶¶ 145-146. Between

2:20 p.m. and 3:30 p.m., Your Hope Center evaluated decedent and learned that, while

decedent denied suicidal ideations, he had contemplated writing a suicide note the day

before. *Id.* at 23, ¶¶ 147-48. Decedent told the Your Hope Center clinician that he

believed he needed to be treated by Centennial Peaks again; the clinician responded

that a transfer to Centennial Peaks was not possible. *Id.*, ¶¶ 149-50.

A deputy checked decedent's cell at 5:12 p.m. *Id.*, ¶ 153. While the deputy

looked under decedent's mattress and touched his pillow, the deputy failed to discover

the noose.  *Id.*  Shortly thereafter, the camera again recoded decedent checking the noose.  *Id.*, ¶ 154.

On April 13 at 12:40 p.m., the camera recorded decedent looking out of his cell door, retrieving the noose, placing the sheet over the cell door, climbing up on the sink, placing the noose around his neck, and stepping off the sink.  *Id.* at 24, ¶ 160.  Plaintiffs allege that the camera recorded decedent hanging from the noose for 15 minutes.  *Id.*, ¶ 161.  At 12:55 p.m. Deputies Vigil and Valdez opened the door to decedent's cell, causing him to fall, and dragged him out of the room.  *Id.*, ¶ 162.  Paramedic Services arrived at the jail and transported decedent to Vail Health, where he was pronounced dead.  *Id.* at 25, ¶ 163.

Plaintiffs allege that Undersheriff Loya failed to train and supervise the other named defendants who worked at ECSO and the Detention Facility and failed to take reasonable measures to protect the health and welfare of those detained at the Detention Facility.  *Id.*, ¶ 167.  Plaintiffs also allege that Undersheriff Loya failed to act upon warnings that decedent was suicidal.  *Id.* at 25-26, ¶¶ 168-69.

## II.  LEGAL STANDARD

### A.  Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534

F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to accept conclusory allegations.  *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B. Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve

questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton, 868 F.3d 1209*, 1220 (10th Cir. 2017) (internal quotation marks omitted). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

A constitutional right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Surat v. Klamser*, 52 F.4th 1261, 1276 (10th Cir. 2022). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Torres v. Madrid*, 60 F.4th 596, 603 (10th Cir. 2023); *see also Irizarry v. Yehia*, 38 F.4th 1282, 1293 (10th Cir. 2022). The relevant precedent is "considered on point if it involves *materially similar conduct* or applies with *obvious clarit*y to the conduct at issue." *Yehia*, 38 F.4th at 1294 (emphasis in original); *see also Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022). "To be clear, we do not require plaintiffs to engage in a scavenger hunt for a prior case with identical facts. We ask whether the existing law provides fair warning to a defendant." *Shepherd*, 55 F.4th at 815 (citations omitted). "When the public official's conduct is egregious, even a general precedent would apply with obvious clarity." *Yehia*, 38 F.4th at 1294 (quoting *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017)); *see also Surat*, 52 F.4th at 1276 (noting that "there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances").

## III. ANALYSIS

The Court will first address the motion to dismiss filed by defendants Undersheriff Loya and the Eagle County Board of Commissioners (the "BOCC"). The Court will then address the motion to dismiss filed by defendant Sergeant Balmore Herrera.

### A. <u>Undersheriff Loya and the BOCC's motion to dismiss</u>

Undersheriff Loya and the BOCC (collectively, the "Eagle County defendants") assert three grounds for dismissal in their motion. Docket No. 43. First, the Eagle County defendants argue that David Lockhart does not have standing to pursue any

claims on his own behalf.  *Id.* at 3-4.  Second, they argue that the complaint asserts
duplicative official-capacity claims and that the only official-capacity claim should be
against Sheriff Van Beek.  *Id.* at 4-6.  Third, they argue that Colorado law does not
provide a cause of action for plaintiffs to seek relief against the BOCC.  *Id.* at 6.

### 1.  Whether David Lockhart has Standing to Pursue Claims On His Own Behalf

The Eagle County defendants argue that David Lockhart does not have standing
to bring his own section 1983 claim for wrongful death and that only the estate of Ian
Lockhart can bring such a claim.  *Id.* at 3-4.  Plaintiffs respond that parents can bring
their own claims for damages resulting from a deprivation of their right to familial
association.  Docket No. 60 at 2-4.

There is a constitutional right to familial relationships, and a person deprived of
such a relationship by an official acting under color of state law may bring a cognizable
claim under section 1983.  *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe*, 768 F.2d 1186,
1188-90 (10th Cir. 1985).  Parents have the right to bring such a claim when their child
has wrongfully died while incarcerated.  *Id.* at 1189.  David Lockhart therefore has
standing to bring a claim against the Eagle County defendants for depriving him of his
right to familial association with his son, Ian Lockhart.

In their reply, the Eagle County defendants raise a new argument, asserting that
even if David Lockhart does have standing to bring a claim for deprivation of familial
association, he has failed to plead such a claim here.  Docket No. 61 at 2-4.
Specifically, they argue that *Trujillo* requires an allegation that the defendants intended
to deprive David Lockhart of his relationship with his son, and that the complaint does
not include any allegations to that effect.  *Id.* (citing *Trujillo*, 768 F.2d at 1190).  The

Court gave plaintiffs an opportunity to file a surreply addressing this argument, Docket No. 76, which plaintiffs did. Docket No. 78. In the surreply, plaintiffs concede that David Lockhart "has not yet specifically alleged that Defendants acted with 'intent to interfere' with his relationship with his son." *Id.* at 2. Plaintiffs thus request that the Court dismiss without prejudice the Section 1983 claim that David Lockhart brings on his own behalf. *Id.*

As the Tenth Circuit explained in *Trujillo*, "an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." 768 F.2d at 1190. Having reviewed the present complaint, the Court finds that there are no allegations that either Undersheriff Loya or the BOCC acted with an intent to deprive David Lockhart of his familial association with his son. Therefore, the Court will dismiss the claim that David Lockhart brings on his own behalf against Undersheriff Loya and the BOCC without prejudice.

### 2. Whether the Complaint's Official-Capacity Claims are Duplicative

The Eagle County defendants argue that the claims in the complaint brought against defendants in their official capacity are duplicative and that only a single official-capacity complaint against Sheriff Van Beek is proper. Docket No. 43 at 4-6. Plaintiffs respond that they must bring multiple official-capacity claims because the facts involving each of the various defendants are distinct. Docket No. 60 at 4-5. The Eagle County defendants reply that the factual distinctions among various defendants are irrelevant because the focus of an official-capacity claim is on the "policy or custom" of the municipal entity that led to the violation of federal law. Docket No. 61 at 5. The Eagle County defendants also argue that, even if Undersheriff Loya is a policymaker for the

purposes of liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), an

official-capacity claim against him is still redundant given the official-capacity claim

against Sheriff Van Beek.  *Id.*

"An action against a person in his official capacity is, in reality, an action against

the government entity for whom the person works."  *Pietrowski v. Town of Dibble*, 134

F.3d 1006, 1009 (10th Cir. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66,

(1985)).  Furthermore, "[a]s long as the government entity receives notice and an

opportunity to respond, an official-capacity suit is, in all respects other than name, to be

treated as a suit against the entity."  *Graham*, 473 U.S. at 166.  Where, as here, the

entity is also named,[4] there is no need for additional official-capacity claims.  As a

result, plaintiffs' official-capacity claim against Undersheriff Loya is redundant,

unnecessary, and potentially confusing.

Courts that have faced similar scenarios – complaints that allege identical claims

against both an entity and agents of that entity in their official capacities – have taken

two tacks.  Some dismiss the claims under federal courts' inherent authority to manage

the cases before them.  *See, e.g.*, *Saleh v. Federal Bureau of Prisons*, No. 05-cv-

02467-PAB-KLM, 2008 WL 6893366, at *5 (D. Colo. July 29, 2008), *recommendation*

*accepted in part and rejected in part on other grounds*, 2009 WL 3158120 (D. Colo.

Sept. 29, 2009) (listing cases).  Others rely on Federal Rule of Civil Procedure 12(f) –

---

[4] Claims against a Colorado county generally require naming the Board of
County Commissioners as the defendant.  *Said v. Teller Cnty.*, No. 14-cv-02745-RPM,
2015 WL 1598098, at *4 (D. Colo. Apr. 9, 2015).  But the county sheriff is a distinct
position under the Colorado Constitution, and civil rights claims involving the policies of
the sheriff's office are appropriately brought against the sheriff in the sheriff's official
capacity.  *Id.*

"[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" – to eliminate redundant official-capacity claims.  *See, e.g.*, *Brown v. City of Mounds, Ill.*, 2009 WL 3055490, at *4 (S.D. Ill. Sept. 22, 2009); *McCleskey v. City of Dothan*, 2009 WL 1258290, at *1-2 (M.D. Ala. May 5, 2009).

In the present case, while either approach would be justified, the Court believes that the proper mechanism for removing the official-capacity claims is Rule 12(f). Therefore, plaintiffs' official-capacity claim against Undersheriff Loya is stricken as redundant, unnecessary, and potentially confusing pursuant to Federal Rule of Civil Procedure 12(f).[5]

### 3.  Whether Colorado Law Allows a Suit against the BOCC

The Eagle County defendants argue that the BOCC is not a proper defendant because the BOCC commissioners and the sheriff are separately elected officials and the BOCC does not exercise managerial control over the sheriff.  Docket No. 43 at 6. The Eagle County defendants further argue that Colorado Revised Statute § 17-26-126, which directs the BOCC to inspect and remedy issues in the jail, does not provide a civil remedy.  *Id.*  Plaintiffs respond that they are bringing a negligence claim, not a statutory claim, that C.R.S. § 17-26-126 creates a mandatory duty that the BOCC breached, and

---

[5] The Court rejects plaintiffs' argument that the distinct facts involving the various defendants necessitate multiple official-capacity claims.  Docket No. 60 at 4-5.  The cases plaintiffs cite in support of this argument, such as *Tufaro v. Okla. ex rel. Bd. of Regents of Univ. of Okla.*, 107 F.4th 1121 (10th Cir. 2024), involve claims brought against defendants in both their official and individual capacities.  *Id.* at 1129.  Plaintiffs' present claim against Undersheriff Loya is only an official-capacity claim.  Docket No. 36 at 34.  Moreover, any factual allegations regarding the various defendants that plaintiffs believe are relevant could still be asserted as part of the official-capacity claim against Sheriff Van Beek.

that plaintiffs, as members of the class meant to be protected by said duty, are able to bring a claim when a public entity violated a statutory duty in a public premises. Docket No. 60 at 6-12. Defendants reply that there is no authority that supports plaintiffs' argument that the BOCC can be held liable for violations occurring in a jail run by the sheriff. Docket No. 61 at 6.

The Court agrees with the Eagle County defendants. Pursuant to Colorado law, "the [county] commissioners and the sheriff are separately elected officials." *Terry v. Sullivan*, 58 P.3d 1098, 1102 (Colo. App. 2002). "[T]he Board [of County Commissioners] does not exercise managerial control over either the sheriff or the detention center and its staff." *Id.*; *see* Colo. Rev. Stat. § 30–10–511 ("[t]he sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself through a deputy or jailer."). The BOCC is granted certain enumerated powers which do not include management of county jails. Colo. Rev. Stat. § 30–11–107; *cf. Richart v. Bd. of Comm'rs of Boulder Cnty.*, 33 P.2d 971, 972–73 (Colo. 1934) (stating, when interpreting the predecessor statutes, that the "general powers conferred upon the board with reference to the county's property generally, when in conflict with the special, particular powers conferred upon the sheriff with reference to jails, must yield to the latter"). Therefore, any allegations regarding the conduct of the ECSO in managing the jail and any resulting harm to the plaintiffs are insufficient to state a claim against the BOCC. The Court will dismiss plaintiffs' claim against the BOCC.

### B. Sergeant Herrera's motion to dismiss

Plaintiffs allege a federal claim under 42 U.S.C. § 1983 and a state law negligence claim against Sgt. Herrera. Docket No. 36 at 49-52. Sgt. Herrera makes

four arguments in his motion to dismiss the two claims against him. First, he argues
that plaintiffs' official-capacity allegations under Section 1983 are insufficient. Docket
No. 47 at 10. Second, he argues that he is entitled to qualified immunity on plaintiffs'
section 1983 claim. *Id.* at 4-8. Third, he argues that the Colorado Governmental
Immunity Act ("CGIA") bars the tort claim against him. *Id.* at 8-9. Fourth, he argues
that, if the Court dismisses the tort claim, Colorado law requires the Court to award him
attorneys' fees and costs. *Id.* at 10-11.

### 1. The Section 1983 Claim against Sgt. Herrera

The caption of the complaint states that Sgt. Herrera is being sued in both his
official and individual capacities. Docket No. 36 at 1. Count XIV of the complaint is a
section 1983 claim against Sgt. Herrera in his official capacity, alleging that Sgt. Herrera
violated the Fourteenth Amendment by being deliberately indifferent to decedent's
health needs. *Id.* at 49-51. Count XV of the complaint is a Colorado state tort claim for
wrongful death against Sgt. Herrera, alleging that Sgt. Herrera acted willfully, wantonly,
and recklessly in taking decedent to the Detention Facility rather than to a hospital. *Id.*
at 51-52. The complaint does not state whether Count XV is against Sgt. Herrera in his
official or individual capacity. *Id.* at 51.

The Court takes plaintiffs at their word that Count XIV is meant to be brought
against Sgt. Herrera in his official capacity. As previously discussed in this order, "[a]n
action against a person in his official capacity is, in reality, an action against the
government entity for whom the person works." *Pietrowski*, 134 F.3d at 1009 (citing
*Graham*, 473 U.S. at 165-66). And claims against a municipality must allege a policy or
custom that violated a person's rights. *Monell*, 436 U.S. at 694. The Court finds that
the complaint is devoid of any allegations regarding the customs or policies of the Town

16

of Avon, Sgt. Herrera's municipal employer.  Plaintiffs essentially concede as much, but they argue that discovery is necessary for them to be able to identify any policies or customs of the Town of Avon that are relevant to the case.  Docket No. 59 at 14.  The law is clear, however, that plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  On this basis alone, the Court will dismiss this claim.

Even if the Court were to interpret the section 1983 claim as being brought against Sgt. Herrera in his individual capacity, qualified immunity would shield him from liability because any right of decedent that Sgt. Herrera allegedly violated was not clearly established.  "[F]or the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Torres*, 60 F.4th at 603 (citation omitted).  The plaintiffs have not identified, nor is the Court aware of, any cases holding that an arresting officer violates an arrestee's rights when the arresting officer is aware of that arrestee's serious mental-health needs, knows that the jail provides mental-health treatment, and informs the jail of the arrestee's need for such services.  In fact, the Tenth Circuit has found no clearly established law in the more problematic context of an arresting officer who is aware of an arrestee's serious mental-health needs, but does not inform the jail of these needs.  *Est. of Simon ex rel. Simon*, 2023 WL 8544800, at *5.

Instead, cases from other circuits on this issue and cases from the Tenth Circuit in the context of other medical needs of arrestees focus on whether the arresting officer informed the jail of the medical concerns or otherwise acted to obtain medical treatment.

*Batton v. Sandusky*, 2024 WL 1480522, at *6-7 (6th Cir. 2024) (denying qualified immunity for an arresting officer who arrested an obviously suicidal man, but did not inform jail officials that the man was suicidal); *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003); *Rife v. Jefferson*, 742 F. App'x 377, 384-86 (10th Cir. 2018) (unpublished) (denying qualified immunity for an officer who arrested a man who had obviously been seriously injured in a motorcycle accident, but did not make any efforts to obtain medical treatment); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1316-17 (10th Cir. 2002) (officer could be held liable for ignoring arrestee's statements about having an OCD-induced panic attack).

Sgt. Herrera's conduct is distinguishable from that of the officers in the cases just discussed.  When decedent told Sgt. Herrera that he wanted to commit suicide, Sgt. Herrera responded that he would be able to speak with someone at the jail who could help with mental-health concerns.  Docket No. 36 at 15, ¶ 97.  Upon arrival at the Detention Facility, Sgt. Herrera wrote on the intake form that decedent had made suicidal statements.  *Id.* at 16, ¶ 97.  Sgt. Herrera also verbally informed the intake officers that decedent had threatened to hang himself in the jail.  *Id.*  And, true to Sgt. Herrera's word, mental-health professionals met with decedent repeatedly during his time in the Detention Facility.  *Id.* at 18-22, ¶¶ 119, 126, 128, 132, 139.  The Court therefore finds that, even if the complaint brings an individual-capacity claim against Sgt. Herrera, he is entitled to qualified immunity.

### 2.  Whether the CGIA Bars Plaintiffs' Wrongful Death Claim against Sgt. Herrera

Sgt. Herrera argues that he is entitled to sovereign immunity under the Colorado Governmental Immunity Act for actions related to plaintiffs' wrongful death claim.

Docket No. 47 at 8-9.  Plaintiffs respond that the CGIA does not apply because Sgt.
Herrera acted in a willful and wanton manner.  Docket No. 59 at 12-14.  Sgt. Herrera
replies that plaintiffs have misstated the law and that none of his actions fall within the
"willful and wanton" exception to the CGIA.  Docket No. 62 at 7-9.

Under the CGIA, public employees generally cannot incur liability for injuries
arising from conduct performed in the course of their employment.  *Quintana v. Dodge*,
2024 WL 1048959, at *3 (10th Cir. Mar. 11, 2024) (citing Colo. Rev. Stat. § 24-10-118.).
There is an exception to this rule when the employee's conduct was willful or wanton.
*Id.*  The Tenth Circuit has described the CGIA exception as applying only in the context
of a conscious disregard of danger when "the conduct had been specifically calculated
to cause the alleged harm or the defendant had been aware that the conduct would
cause the harm."  *Id.* at *4 (citing *McDonald v. Wise*, 769 F.3d 1202, 1218 (10th Cir.
2014)).  In *Quintana*, two police officers threw tear gas canisters into the house of a
suspect, and the canisters started a deadly fire.  *Id.* at *1.  The court held that the
plaintiff failed to show willful and wanton conduct because the evidence showed only
that the officers knew that the canisters "could" cause a fire, not that they "would" cause
a fire.  *Id.* at *5-6.  In the context of an arresting officer failing to obtain healthcare for an
arrestee, the Tenth Circuit has similarly held that the willful and wanton standard
requires that the officer "know" of the danger, not just that the officer "should have
known" of it.  *Schmitz v. Colo. State Patrol*, 841 F. App'x 45, 57 (10th Cir. 2020)
(unpublished).

The complaint is devoid of any allegations that Sgt. Herrera, by taking decedent
to the Detention Facility rather than to a hospital, specifically calculated that his actions

would lead to decedent committing suicide.  Nor is there any allegation that Sgt. Herrera

knew that decedent would commit suicide if taken to the Detention Facility.  The

complaint asserts that Sgt. Herrera's decision to take decedent to the Detention Facility

was a deliberate decision to deprive decedent of medical care.  Docket No. 36 at 51-52,

¶¶ 301-302.  But plaintiffs undercut their argument by also alleging in the complaint that

Sgt. Herrera intended for decedent to receive mental-health services at the Detention

Facility, *id.* at 15-16, ¶ 97, and that such services were indeed available at the Detention

Facility.  *Id.* at 18-22, ¶¶ 119, 126, 128, 132, 139.  The Court finds that plaintiffs have

failed to allege that Sgt. Herrera acted in a willful and wanton manner, and that

therefore the CGIA serves to shield Sgt. Herrera from liability on this claim.  The Court

will dismiss the wrongful death claim against Sgt. Herrera.

### 3.  Whether Sgt. Herrera is Entitled to Attorneys' Fees for the State Claim

Sgt. Herrera argues that, if the Court dismisses the wrongful death claim against

him, as it has, Colorado law requires the Court to award him attorneys' fees and costs

for defending himself against that claim.  Docket No. 47 at 10-11.  Plaintiffs respond that

awarding fees is not appropriate in the context of a complaint alleging both federal and

state claims.  Docket No. 59 at 14-15.  Sgt. Herrera's reply did not discuss this issue

further.

Federal courts exercising supplemental jurisdiction over a state-law claim apply

the substantive law of the state.  *In re HomeAdvisor, Inc. Litigation*, No. 16-cv-01849-

PAB-KAS, 345 F.R.D. 208, 228 (D. Colo. 2024).  In the Tenth Circuit, attorneys' fees

statutes are considered substantive.  *See Jones v. Denver Post Corp.*, 203 F.3d 748,

757 (10th Cir. 2000), *abrogated on other grounds by National R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101 (2002). A determination of whether to award attorneys' fees

begins with the American Rule, which precludes an award of attorneys' fees absent a

specific contractual, statutory, or procedural rule providing otherwise. *City of Aurora ex*

*rel. Util. Enter. v. Colo. State Eng'r*, 105 P.3d 595, 618 (Colo. 2005) (citing *Alyeska*

*Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)); see also *Buder v.*

*Sartore*, 774 P.2d 1383, 1390 (Colo. 1989). Sgt. Herrera argues that he is entitled to

attorneys' fees under Colo. Rev. Stat. § 13-17-201, which applies to tort claims

dismissed at the motion-to-dismiss stage, and Colo. Rev. Stat. § 24-10-110(5)(c).

Docket No. 47 at 10-11.[6] Sgt. Herrera also seeks costs under Colo. Rev. Stat. § 13-16-

113(2). *Id.* at 11.

Cases addressing motions for attorneys' fees under Colo. Rev. Stat. § 24-10-

110(5)(c) have held that the statute does not apply in cases where the claim is primarily

a section 1983 claim and the state law claim arises from the same alleged facts and

conduct as the federal claim. *Brooks v. Gaenzle*, No. 06-cv-01436-CMA-MJA, 2009 WL

4949922, at *3 (D. Colo. Dec. 15, 2009) (citing *Haynes v. City of Gunnison*, 214

F. Supp. 2d 1119, 1122-23 (D. Colo. 2002)). While *Brooks* and *Haynes* do not address

Colo. Rev. Stat. § 13-17-201, the statute's language is similar to Colo. Rev. Stat. § 24-

10-110(5)(c). Moreover, the Colorado Supreme Court has held that section 13-17-201

is in derogation of the long-established American Rule and must be construed narrowly.

*Crandall v. City of Denver*, 238 P.3d 659, 662 (Colo. 2010). As such, the Court finds

that section 13-17-201 should be limited in the same way as section 24-10-110(5)(c).

---

[6] Colo. Rev. Stat. § 24-10-110(5)(c) applies to claims for exemplary damages brought against public officials for willful and wanton conduct where the plaintiff does not "substantially prevail."

The complaint's allegations against Sgt. Herrera in the federal and state claims are essentially the same, with both counts focusing on Sgt. Herrera's decision to transport decedent to the Detention Facility rather than to a hospital.  Docket No. 36 at 49-52. Therefore, the Court finds that neither section 13-17-201 nor section 24-10-110(5)(c) applies to the present case, and that Sgt. Herrera is not entitled to attorneys' fees.

Section 13-16-113(2) is not, however, in derogation of any general rule, *Crandall*, 238 P.3d at 662, and it applies in federal court.  *Infant Swimming Rsch., Inc. v. Heumann*, No. 07-cv-00839-LTB-BNB, 2008 WL 11435774, at *4 (D. Colo. 2008).  But, although Sgt. Herrera may be entitled to costs, the award of costs under section 13-16-113(2) is "committed to the sole discretion of the trial court."  *Infant Swimming Rsch., Inc. v. Faegre & Benson, LLP*, 335 F. App'x 707, 717 (10th Cir. 2009) (unpublished) (quoting *City of Westminster v. Centric–Jones Constructors*, 100 P.3d 472, 487 (Colo. App. 2003)).  The Court will order Sgt. Herrera to file a motion detailing the costs he believes he is entitled to recover, along with supporting documentation, within three weeks of this order.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** Undersheriff Dan Loya and the Board of County Commissioners' Motion to Dismiss Claims in the First Amended Complaint [Docket No. 43] is **GRANTED**.  It is further

**ORDERED** that David Lockhart's claims on his own behalf against Undersheriff Dan Loya and the Eagle County Board of Commissioners are **DISMISSED without prejudice**.  It is further

ORDERED that Count IV against Undersheriff Dan Loya is **DISMISSED without prejudice**.  It is further

ORDERED that Count XIII against the Eagle County Board of Commissioners is **DISMISSED without prejudice**.  It is further

ORDERED that defendants Undersheriff Dan Loya and the Eagle County Board of Commissioners are **DISMISSED** from this case.  It is further

ORDERED that Defendant Herrera's Motion to Dismiss Plaintiffs' First Amended Complaint [Docket No. 47] is **GRANTED in part** and **DENIED in part**.  It is further

ORDERED that Counts XIV and XV against Sgt. Balmore Herrera are **DISMISSED without prejudice**.  It is further

ORDERED that defendant Sgt. Balmore Herrera is **DISMISSED** from this case. It is further

ORDERED that Sgt. Balmore Herrera may file a motion for costs on or before **March 21, 2025** in compliance with D.C.COLO.LCivR 54.1.

DATED February 28, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge