IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 24-cv-00991-PAB-TPO

ESTATE OF IAN DAVID LOCKHART, by and through its personal representative,
DAVID LOCKHART, and
DAVID LOCKHART, individually,

    Plaintiffs,

v.

SHERIFF JAMES VAN BEEK, in his official and individual capacities,
CAPTAIN GREGORY VAN WYK, in his official and individual capacities,
DEPUTY ANTHONY VALDEZ, in his individual capacity,
DEPUTY ANDREW VIGIL, in his individual capacity,
EAGLE COUNTY SHERIFF'S OFFICE,
BEHAVIORAL HEALTH CRISIS SERVICES, INC. d/b/a Your Hope Center,
TERESA HAYNES, in her individual capacity,
TAYLOR WALKER, in her individual capacity,
VICKY BIBLER, in her individual capacity,
CATHY SCHNEIDER, in her individual capacity,
STACIE FREUDENBERG, in her individual capacity, and
JENNIFER KIM, in her individual capacity,

    Defendants.

## ORDER

This matter comes before the Court on Defendants Behavioral Health Crisis Services, Inc., Vicky Bibler, Cathy Schneider, Stacie Freudenberg, Teresa Haynes, Jennifer Kim, and Taylor Walker's Motion to Dismiss [Docket No. 115]. Defendants Behavioral Health Crisis Services, Inc. ("Your Hope Center"), Vicky Bibler, Cathy Schneider, Stacie Freudenberg, Teresa Haynes, Jennifer Kim, and Taylor Walker (collectively, the "moving defendants") seek to dismiss, pursuant to Federal Rule of Civil

Procedure 12(b)(6), plaintiffs' deliberate indifference and negligence claims against them. Docket No. 115 at 1. Plaintiffs, David Lockhart and the Estate of Ian David Lockhart filed a response. Docket No. 119. The moving defendants filed a reply. Docket No. 120. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

## I. BACKGROUND[1]

This case arises out of the suicide of Ian David Lockhart ("decedent") while in pretrial detention at the Eagle County Detention Facility ("Detention Facility") in Eagle County, Colorado on April 13, 2023. Docket No. 88 at 2, ¶¶ 1-3. The Detention Facility is run by the Eagle County Sheriff's Department (the "ECSO"). *Id.* at 5, ¶ 19. The plaintiffs are the estate of Ian David Lockhart, as represented by decedent's father and personal representative, David Lockhart (the "estate"), and David Lockhart on his own behalf. *Id.* at 3-4, ¶¶ 9-10. The defendants are Sheriff James Van Beek, the Sheriff of Eagle County; Captain Gregory Van Wyk, the ECSO officer in charge of the Detention Facility; ECSO Undersheriff Dan Loya; ECSO Deputies Anthony Valdez and Andrew Vigil; the ECSO itself;[2] Your Hope Center, a mental health provider working with the Detention Facility; Vicky Bibler, a licensed clinical social worker at Your Hope Center; Cathy Schneider, a licensed clinical social worker at Your Hope Center; Stacie Freudenberg a licensed psychologist at Your Hope Center; Teresa Haynes, a licensed psychologist and licensed professional counselor at Your Hope Center; Jennifer Kim, a

---

[1] The facts below are taken from plaintiffs' third amended complaint, Docket No. 88, and are presumed to be true, unless otherwise noted, for purposes of ruling on defendants' motion to dismiss.
[2] While the ECSO is listed in the caption of the complaint, Docket No. 88 at 1, no counts within the complaint are specifically directed at the ECSO.

2

licensed professional counsel at Your Hope Center; and Taylor Walker, a licensed professional counsel at Your Hope Center. *Id.* at 1, 4-6.

Decedent's first alleged interaction with law enforcement occurred on January 15, 2023, when ECSO deputies detained him for making suicidal statements. *Id.* at 8, ¶¶ 33-38. Members of the Eagle County Paramedic Services ("Paramedic Services") assessed decedent and transported him to Vail Health. *Id.*, ¶¶ 36-38. The next day, Vail Health had decedent transferred to Centennial Peaks Hospital, a behavioral health hospital, on an M1 Psychiatric Hold.[3] *Id.* at 9, ¶¶ 41-44. Centennial Peaks discharged decedent on January 20, 2023 after diagnosing him with major depressive disorder and prescribing him several medications. *Id.* at 10, ¶¶ 45-46.

On January 30, 2023, officers from the Avon Police Department ("APD") responded to a disturbance call regarding decedent. *Id.*, ¶ 47. APD placed decedent into custody and outfitted him with a helmet to protect him from self-harm. *Id.*, ¶ 48. APD Officer Corey S. Baldwin transported decedent to the Detention Facility; during the drive to the Detention Facility, decedent repeatedly stated his intention to commit suicide. *Id.*, ¶¶ 49-50. At the Detention Facility, ECSO employees initiated protocols for a suicidal detainee, and Officer Baldwin completed an intake form noting that decedent was suicidal. *Id.* at 10-11, ¶¶ 51-53.

On February 4, 2023, APD was again called to a disturbance involving decedent. *Id.* at 11, ¶ 55. APD Officer Jonathan P. Lovins arrested decedent and transported him to Vail Health; during the drive to Vail Health, decedent stated that he wanted the police

---

[3] Colo. Rev. Stat. § 27-65-101 provides for an M1 Psychiatric Hold when an individual is deemed to be in imminent danger of harming himself or others. Docket No. 88 at 9, ¶ 42.

3

to kill him. *Id.* at 11-12, ¶¶ 56-60. After an initial assessment at Vail Health, which involved several more statements by decedent regarding his desire for the police to kill him, a Vail police officer transported decedent to the Detention Facility. *Id.* at 11-12, ¶¶ 59-65. Upon arrival at the Detention Facility, Cathy Schneider performed a "Crisis Jail Initial Evaluation" of decedent and learned of his desire either to kill himself or to be killed by a police officer. *Id.* at 12-13, ¶¶ 67-72. Ms. Schneider found that decedent met the criteria for an M1 Psychiatric Hold, and decedent was placed on that hold. *Id.* at 13, ¶ 75. Paramedic Services then transported decedent back to Vail Health. *Id.*, ¶ 76. The next day, February 5, 2023, a mental-health provider at Vail Health assessed decedent. *Id.* at 14-15, ¶¶ 82-86. On February 6, 2023, Paramedic Services transported decedent to Centennial Peaks. *Id.* at 15, ¶ 87. Mental-health providers at Centennial Peaks assessed decedent and admitted him to the hospital. *Id.* at 16-17, ¶¶ 91, 95. After treating decedent, Centennial Peaks released him into police custody on February 10, 2023. *Id.* at 17, ¶ 98.

On April 6, 2023, Sergeant Balmore Herrera of the APD responded to a disturbance call involving decedent. *Id.*, ¶ 99. Sergeant Herrera arrested decedent and transported him to the Detention Facility. *Id.*, ¶ 100. According to the complaint, Sergeant Herrera wrote the following regarding his interactions with decedent:

> As we were escorting Ian down the stairs, he began yelling at his father, that he was going to kill himself and that he would be responsible, he told his happy[sic] that he hoped he would be happy knowing that Ian killed himself because of him. Ian was verbally abusive towards me, he stated he wanted to go to the hospital, I asked him why, he stated that he wanted to kill himself and preferred to be at the hospital instead of the jail. I advised Ian that I would notify the jail deputies of his statement, and I would ensure that he had the ability to speak with someone who could help him. Ian stated he didn't want to speak to the hope center, I explained to Ian that the jail would be able to provide him with resources. During the transport to the Jail, Ian's demeanor would change from crying, kicking the cage

4

> and at times hitting his head on the side plexi-glass. Every time I observed Ian hit his head, I would ask him not to do it, he would immediately stop. He did this several times, but complied every time I asked him to stop. Ian continually repeated that he was going to kill himself once he got to the jail, that it was easy for him to hang himself and that I would be responsible for his death.
> 
> Once at the jail, Ian refused to exit the car, I unbuckled the prisoner restraint, Ian kept trying to hit his head. I assisted Ian out of the vehicle, cradling his head with my arm to ensure he wouldn't hit me or try to otherwise hurt himself. Once Ian was out of the vehicle, I transitioned to an escort hold and escorted Ian into the holding area of the jail. Ian would refuse to sit down, I applied direct pressure above his hip near his abdomen to assist him into a sitting position, I did not want Ian ambulatory to prevent Ian from injuring himself. I secured Ian to the bench by utilizing one of the restraint loops and a second set of handcuffs. Ian continued his verbal aggression towards me, the jail deputies exited and attempted to de-escalate Ian, he did not listen and continually made suicidal statements to them. I filled out the pre-booking questionnaire, one of the questions was regarding suicidal statements made by the arrestee, I checked yes on that portion of the form and advised Jail Deputies that Ian had threatened to hang himself once inside the jail. I was advised by the Jail Deputies that they would take note of that, and that Ian also made similar statements to them. I transferred custody of Ian to the ECSO Jail Deputies.

*Id.* at 17-18, ¶ 101.

Once at the Detention Facility, decedent was "wrapped and fogged," a process that involves being dressed in a mesh outfit, placed in a restraint chair, and sprayed with pepper spray. *Id.* at 19, ¶ 103. ECSO officials also placed decedent into the jail's STEP monitoring system for inmates at risk of committing suicide. *Id.*, ¶ 109. Initially, decedent was at the STEP 1 level, which meant that decedent's cell was without any items that he might be able to use as a ligature, and deputies were required to check on decedent every 15 minutes. *Id.*, ¶¶ 110-112. During this time, Deputy Vigil observed decedent kicking his cell and smearing feces on the wall, and both Deputies Vigil and Valdez heard decedent making suicidal statements. *Id.* at 20, ¶¶ 116-120.

Mental-health assessments for decedent also began on April 6. *Id.* at 21, ¶¶ 121-123. Dr. Haynes and Ms. Walker from Your Hope Center assessed decedent

5

that day and heard his suicidal statements and observed his behaviors.  *Id.* at 21, 50, ¶¶ 123, 277-78.  After the evaluation, Dr. Haynes, the clinical director of Your Hope Center, recommended to Captain Van Wyk that decedent be hospitalized so that he could receive a higher level of care.  *Id.* at 22, ¶¶ 125-28.  Captain Van Wyk rejected that recommendation.  *Id.*, ¶ 128.

An evaluation by Ms. Bibler on April 7, 2023 found that decedent was still suicidal.  *Id.* at 22, 50-51, ¶¶ 130, 279.  An evaluation by Ms. Schneider and Ms. Kim on April 8, 2023 found that decedent was flat and agitated and that, while he denied safety concerns, he stated that there would be problems if he remained in a cell alone.  *Id.* at 23, 51, ¶¶ 132, 280-81.  On April 8, 2023 decedent moved to STEP 2, at which point he received a normal mattress, bedding, and clothes, and deputies were to check on him every 30 minutes.  *Id.* at 23, ¶ 133.  On April 10, ECSO deputies again "fogged" decedent.  *Id.*, ¶ 135.  Your Hope Center evaluated decedent that day and found that decedent was struggling with the STEP program and that he was thinking about his sister who had died recently.  *Id.*, ¶ 136.[4]  On April 10, 2023 decedent moved to STEP 3, where he received some personal items, but was still to be checked on every 30 minutes.  *Id.*, ¶ 137.  Decedent remained in a solitary cell, with a video camera monitoring every part of the cell except for the toilet.  *Id.*, ¶ 138.

On April 11, 2023 ECSO Deputy Kyle DeVries wrote a staff-wide email to the Detention Facility staff saying that decedent had stated that he wanted to die and that he would tell Your Hope Center staff whatever they wanted to hear in order to "get out

---

[4] The complaint does not state which employee from Your Hope Center performed this evaluation.

6

of holding." *Id.* at 24, ¶¶ 139-41.  Deputy Anthony Valdez, who worked at the Detention Facility, received this email and relayed its contents to Ms. Freudenberg on April 12, 2023 before she conducted her assessment of decedent.  *Id.* at 24, 26, 51, ¶¶ 141-43, 155, 283.

On April 12, 2023 at 1:39 p.m., the video camera in decedent's cell recorded him fashioning his bedsheet into a noose, putting it around his neck, adjusting it, and then hiding the noose under his blanket.  *Id.* at 25, ¶ 148.  The video shows him tinkering with the noose again at 1:50 p.m. and 2:02 p.m.  *Id.*, ¶¶ 149-150.  Between 2:20 p.m. and 3:30 p.m., Ms. Freudenberg evaluated decedent and learned that, while decedent denied suicidal ideations, he had contemplated writing a suicide note the day before. *Id.* at 25, 51, ¶¶ 151-52, 283.  Decedent told Ms. Freudenberg that he believed he needed to be treated by Centennial Peaks again; Ms. Freudenberg responded that a transfer to Centennial Peaks was not possible.  *Id.* at 26, ¶¶ 153-54.

A deputy checked decedent's cell at 5:12 p.m.  *Id.*, ¶ 157.  While the deputy looked under decedent's mattress and touched his pillow, the deputy failed to discover the noose.  *Id.*  Shortly thereafter, the camera again recoded decedent checking the noose.  *Id.*, ¶ 158.

On April 13, 2023 at 12:40 p.m., the camera recorded decedent looking out of his cell door, retrieving the noose, placing the sheet over the cell door, climbing up on the sink, placing the noose around his neck, and stepping off the sink.  *Id.* at 27, ¶ 164. Plaintiffs allege that the camera recorded decedent hanging by the noose attached to the cell door for 15 minutes.  *Id.*, ¶ 165.  At 12:55 p.m. Deputies Vigil and Valdez opened the door to decedent's cell, causing decedent to fall, and dragged him out of the

7

room. *Id.*, ¶ 166. Paramedic Services arrived at the jail and transported decedent to Vail Health, where he was pronounced dead. *Id.*, ¶ 167.

Plaintiffs allege that the Your Hope Center-employee defendants were "intervening professionals" within the meaning of Colo. Rev. Stat. § 27-65-105(1)(a) with the power to order a 72-hour mental health hold and cause decedent to be transported to an appropriate mental health facility. *Id.* at 52, ¶ 287. None of the Your Hope Center employees elected to place decedent on a mental health hold and have him transported to a mental health facility. *Id.* at 53, ¶ 292.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g., Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

Plaintiffs allege, under 42 U.S.C. § 1983, one count of deliberate indifference in violation of decedent's Eight and Fourteenth Amendment rights against the moving defendants. Docket No. 88 at 49-54. Plaintiffs also allege a negligence claim against the moving defendants. *Id.* at 54-56.

### A. Deliberate Indifference

An Eighth Amendment claim of deliberate indifference to an inmate's serious medical needs involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006). "Under the objective inquiry, the alleged deprivation must be sufficiently serious to constitute a deprivation of constitutional dimension." *Id.* (internal quotations and citation omitted). An objectively serious medical need or condition is "one that has been

9

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Riddle v. Mondragon,* 83 F.3d 1197, 1202 (10th Cir. 1996) (citations omitted). Where a plaintiff is alleging a delay in medical care, she must show that the alleged delay resulted in substantial harm. *Sealock v. Colo.*, 218 F.3d 1205, 1210 (10th Cir. 2000).

Under the subjective inquiry, the plaintiff must establish that the medical professional "knows of and disregards an excessive risk to inmate health or safety." *Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). A medical professional "disregards risk when [she] fails to take reasonable measures to abate the risk." *Id*. The plaintiff can satisfy the subjective inquiry by showing that the medical professional either (1) failed to properly treat a serious medical condition or that she (2) prevented the plaintiff "from receiving treatment or denie[d] access to someone capable of evaluating the inmate's need for treatment." *Id*. The first theory is known as the "failure to properly treat theory," and the second theory is known as the "gatekeeper theory." *Id.* Under the failure to properly treat theory, the question is "whether there was a functional denial of care at the time the need for treatment obviously arose." *Id.* at 1138. The gatekeeper theory applies where the medical professional "knows that his or her role in a medical emergency is solely to refer the patient to another." *Id.* at 1137. Under the gatekeeper theory, a medical professional "may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.'" *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock*, 218 F.3d at 1211). "Even a brief delay in treatment can be unconstitutional." *Lucas*, 58 F.4th at 1137. A medical professional

can be held liable under both theories where her role "involves treating the patient while simultaneously considering the need for referral to someone with more specialized training at the same time." *Id.* at 1143.

The Court understands plaintiffs to allege deliberate indifference against the moving defendants under a gatekeeper theory because the only deficiency in care that plaintiffs identify is that none of the moving defendants placed decedent on an M1 hold and transferred him from the Detention Facility to a mental health facility. *See generally* Docket No. 88 at 52-54, ¶¶ 285-298. The Court does not read the complaint to allege any "functional denial of care at the time the need for treatment obviously arose."[5] *Lucas*, 58 F.4th at 1138. Instead, the allegations reflect that various of the moving defendants continued to meet with and evaluate decedent during his time in the Detention Facility. *See* Docket No. 88 at 50-51, ¶¶ 276-283. Moreover, although the complaint asserts that decedent had been moved from the more-restrictive STEP 1 of the Detention Facility suicide-watch protocol to the less-protective STEP 2 and STEP 3 levels, *id.* at 23, ¶¶ 133, 137, it does not allege that the moving defendants directed those changes and it does not allege that any of the moving defendants tried to remove decedent from the suicide-watch protocol. The complaint also alleges that none of the moving defendants took any action "with respect to" the videos of decedent fashioning a noose. *Id.* at 26, ¶ 159. But the complaint does not allege that any of the moving

---

[5] Plaintiffs state in their opposition brief, Docket No. 119 at 5, that "defendant Schneider moved Decedent from STEP 1 to STEP 2," and later "Defendant Schneider moved Decedent from STEP 2 to STEP 3," citing the amended complaint, Docket No. 88 at 23, ¶ 137. However, paragraphs 133 and 137 of the complaint do not mention Ms. Schneider and do not mention the moving defendants at all.

11

defendants actually saw such videos, much less that they failed to take action upon seeing the videos.[6]

The Court finds no allegations sufficient to support a claim that the moving defendants acted with deliberate indifference pursuant to a gatekeeper theory. On April 6, 2023, Dr. Haynes met with Captain Van Wyk and informed him that she believed decedent required a higher level of mental health care and recommended that decedent be hospitalized. *Id.* at 22, ¶¶ 126-127. Captain Van Wyk denied the request, indicating that the Detention Facility could take care of decedent and that hospitalization was not a viable option. *Id.*, ¶ 128.

Plaintiffs make no allegations that the moving defendants had any ability to override the decision of the Detention Facility and somehow unilaterally extricate the decedent from custody to take him to a hospital. Plaintiffs, however, argue that the moving defendants acted with deliberate indifference because they did not "escalate the concern, advocate more forcefully, or refuse to provide care in an environment they deemed unsafe for a suicidal patient." Docket No. 119 at 10. Plaintiffs do not cite any authority in support of the proposition that a gatekeeper's role in this situation must go beyond making recommendations to the Detention Facility, and must instead involve more forceful advocacy or a work stoppage. The Court has not identified any such support for plaintiffs' theory.

---

[6] Plaintiffs argue that the ability of the moving defendants to have overridden the Detention Facility's refusal to hospitalize the decedent, their ability to watch the cell videos, and their ability to unilaterally transport the decedent to a hospital raise factual issues that justify the denial of the motion to dismiss. Docket No. 119 at 10, 12-14. However, plaintiffs' failure to allege that the moving defendants had the ability to do any of these things does not raise factual issues, but rather is a pleading deficiency.

12

Plaintiffs assert that the moving defendants' deliberate indifference is based on their failure to order an M1 Psychiatric Hold pursuant to Colo. Rev. Stat. § 27-65-106(1)(a)(II). *See* Docket No. 88 at 53, ¶ 292. As the moving defendants note, *see* Docket No. 115 at 8-10, the mere violation of a state statute is not a basis for a Section 1983 claim. *See Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1164 (10th Cir. 2003) ("A violation of state law cannot give rise to a claim under section 1983."). Plaintiffs respond that they cite Colo. Rev. Stat. § 27-65-106(1)(a)(II) not to create a basis for their Section 1983 claim, but as something that shows the moving defendants faced a grave situation and had a "heightened professional responsibility." Docket No. 119 at 11-12. But the question for the subjective prong of the deliberate indifference inquiry that is most relevant here is whether the moving defendants disregarded "an excessive risk to inmate health or safety." *Lucas*, 58 F.4th at 1137. The complaint alleges that the moving defendants sought a higher level of care for decedent and that Captain Van Wyk denied that request. Docket No. 88 at 22, ¶¶ 125-128. The gravity of the situation and any "heightened professional responsibility" that may have existed do not change the fact that, according to the complaint, the moving defendants did not disregard an excessive risk to inmate safety but instead tried to address that risk by requesting a higher level of care from the officials who controlled decedent's custody. The Court will dismiss without prejudice plaintiffs' deliberate indifference claim against the moving defendants.[7]

---

[7] The moving defendants argue that plaintiffs failed to plead the objective prong of a deliberate indifference claim. Docket No. 115 at 7. The Court does not reach this argument because it finds that plaintiffs' claim fails at the subjective prong.

13

### B. Negligence

In order to assert a prima facie case for negligence under Colorado law, a plaintiff must allege 1) the existence of a legal duty to the plaintiff, 2) defendants breached that duty, 3) the plaintiff was injured, and 4) defendants' breach of duty caused the injury. *Raleigh v. Performance Plumbing & Heating*, 130 P.3d 1011, 1015 (Colo. 2006). The moving defendants argue that plaintiffs' negligence claim should be dismissed for failing to allege the first, second, and third elements of the claim. Docket No. 115 at 11-15.

"When a claimant levels a negligence or fault claim against a professional, that professional is judged according to the tenets of the field to which he or she belongs. The successful claimant will therefore demonstrate that the professional's conduct fell below the standard of care appropriate to the profession." *Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 80 (Colo. 2001) (internal citation omitted). Here, plaintiffs allege that the moving defendants had "a duty to provide medical and mental health care to detainees at [the Detention Facility], including Decedent." Docket No. 88 at 55, ¶ 304. Plaintiffs allege this "includes a duty to provide reasonable care to prevent inmates known to be at risk for suicide from committing suicide, a duty to properly classify such detainees and house them accordingly, and a duty to properly supervise and monitor these detainees at risk of self harm." *Id.* The only breach of duty plaintiffs allege, however, is the moving defendants' failure to "have Decedent hospitalized or transported to an appropriate mental health care facility." *Id.* at 55-56, ¶ 307. Given that the moving defendants sought to have decedent transferred to a mental health care facility, and given that Captain Van Wyk denied that request, a breach of duty would only exist if the moving defendants had a duty to continue advocating for higher-level

14

care, to protest, or to somehow override Captain Van Wyk's decision that decedent should remain at the jail. Plaintiffs argue that such a duty existed. *See* Docket No. 119 at 13-14. However, plaintiffs provide no authority under Colorado law, or the law of any other state, that imposes a duty of care on a jail medical provider to do any of the things that plaintiffs identify after having already made an appropriate request for hospitalization.

The Court also finds that Colo. Rev. Stat. § 27-65-106(1)(a)(II) is not a basis for finding that the moving defendants breached a duty. The statute states that:

> When an intervening professional[8] reasonably believes that a person appears to have a mental health disorder and, as a result of the mental health disorder, appears to be an imminent danger to the person's self or others or appears to be gravely disabled, the intervening professional may cause the person to be taken into protective custody and transported to a facility designated by the commissioner for an emergency mental health hold. If such a facility is not available, the certified peace officer may transport the person to an emergency medical services facility. The intervening professional may request assistance from a certified peace officer, a secure transportation provider, or a behavioral health crisis response team for assistance in detaining and transporting the person, or assistance from an emergency medical services provider in transporting the person.

Colo. Rev. Stat. § 27-65-106(1)(a)(II) (footnote added). Colorado recognizes the tort of negligence *per se* where "legislative enactments such as statutes and ordinances can prescribe the standard of conduct of a reasonable person such that a violation of the legislative enactment constitutes negligence." *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 573 (Colo. 2008) (citation omitted). However, for negligence *per se* to apply, "the relevant statute needs to prescribe or proscribe some relatively discrete action." *See Hendrickson v. Doyle*, 150 F. Supp. 3d 1233, 1239 (D. Colo. 2015) (citing

---

[8] The definition of "intervening professional" includes licensed professional counselors and social workers. *See* Colo. Rev. Stat. § 27-65-102(20)(e),(g).

*Lyons v. Nasby*, 770 P.2d 1250, 1257–58 (Colo. 1989)); *see also Bauer v. Sw. Denver Mental Health Ctr., Inc.*, 701 P.2d 114, 118 (Colo. App. 1985) ("It is an essential element of negligence *per se* that the statute proscribe or prescribe specific conduct on the part of the tortfeasor, . . . that is, detail whether 'particular acts shall or shall not be done' by the party charged with observing the statute.") (quoting *Sego v. Mains*, 578 P.2d 1069, 1071 (1978)).  The Court finds that Colo. Rev. Stat. § 27-65-106(1)(a)(II), which states that "[t]he intervening professional may request assistance from a certified peace officer, a secure transportation provider, or a behavioral health crisis response team for assistance in detaining and transporting the person, or assistance from an emergency medical services provider in transporting the person," uses permissive language ("may request assistance") and thus does not create a basis for a negligence per se claim.  *See Bauer*, 701 P.2d at 118.  The Court therefore rejects plaintiffs' argument that the statute is a basis for finding negligence on the part of the moving defendants.  The Court will dismiss without prejudice plaintiffs' negligence claim against the moving defendants and will grant the moving defendants' motion to dismiss.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants Behavioral Health Crisis Services, Inc., Vicky Bibler, Cathy Schneider, Stacie Freudenberg, Teresa Haynes, Jennifer Kim, and Taylor Walker's Motion to Dismiss [Docket No. 115] is **GRANTED**.  It is further

**ORDERED** that Count XII and Count XIII are **DISMISSED without prejudice**.  It is further

**ORDERED** that defendants Behavioral Health Crisis Services, Inc., Vicky Bibler, Cathy Schneider, Stacie Freudenberg, Teresa Haynes, Jennifer Kim, and Taylor Walker are **DISMISSED** from this case.

DATED March 5, 2026.

BY THE COURT:

_____
PHILIP A. BRIMMER
United States District Judge